

U.S. Department of Justice

United States Attorney
Eastern District of New York

AB:MS

271 Cadman Plaza East
Brooklyn, New York 11201

September 9, 2023

<u>By E-mail</u>

The Honorable James R. Cho
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Justin Nudelman
     <u>Magistrate Docket No. 23-806 (JRC)</u>

Dear Judge Cho:

  The government respectfully submits this letter in support of its motion for a permanent order of detention for defendant Justin Nudelman (the "defendant" or "Nudelman"). Nudelman—a prior felon with convictions for firearms possession and attempted assault with a weapon—is a prolific purchaser of parts used to create illegal, unserialized "ghost guns." To date, the government has identified at least 80 shipments of such parts to Nudelman's residence. And when officers searched that residence, they recovered multiple firearms, ammunition, and devices that can convert ordinary firearms into machine guns.

  Nudelman has spent the last several weeks in hospitals recovering from a motorcycle accident, and during that time made such alarming threats to hospital staff that he had to be removed and transferred to another hospital. He then had to be medically sedated after repeatedly shouting and throwing objects around his hospital room, including food and his own urine.

  Given Nudelman's prior convictions, the volume of firearms and related parts found at his residence, and his aggressive and erratic behavior, there is no condition or combination of conditions that can reasonably secure the safety of the community if he is released.

I.      Background

Nudelman is a prior felon who, in 2014, was convicted of second degree attempted assault with intent to cause injury with a weapon/instrument, a class E felony. More recently, in 2017, Nudelman was convicted of criminal possession of a firearm in the 4th degree, a class A misdemeanor.[1]

Nudelman is also a large-scale purchaser of firearms parts that are used to assemble unserialized privately made firearms, colloquially referred to as "ghost guns." From in or about January 2021 through the present, Nudelman received at least 80 shipments of such parts from various online retail stores. Documents obtained by law enforcement officers reflect that each of these purchases was made using electronic usernames that resembles Nudelman's name, such as "justinudelma-0" or "jusnude-58," and that the shipping address for each purchase was Nudelman's address on Corona Avenue in Staten Island. These firearm parts include ammunition magazines for multiple handgun models, 9 millimeter barrels, night sights, laser and other optic sights, lower parts kits that contain the internal components necessary to build completed firearms, and a safety parts kit for a 12-gauge Mossberg 500 Shotgun.

On September 7, 2023, NYPD officers executed a search warrant on Nudelman's residence on Corona Avenue. Inside, officers recovered, among other things:

- nine privately made auto sears;[2]
- a privately made firearm modeled after a SIG Sauer, model P320, .40 caliber pistol, as well as ten rounds of .40 caliber ammunition for that firearm;
- a GlockStore, Model SS80, 9 millimeter pistol, privately made firearm modeled after a Glock Model 43, 9 millimeter pistol, as well as six rounds of nine millimeter ammunition for that firearm;

---

[1] Nudelman also has a 2013 conviction for grand larceny in the 4th degree, for property worth more than $1000.

[2] An auto sear, which can also be known as a switch, is a small device that when affixed to the back of a firearm converts the firearm into a fully automatic weapon, and which is therefore a machinegun, as defined in 26 U.S.C. § 5845(b). A machinegun, as defined in 26 U.S.C. § 5845(b), is any weapon which shoots, is designed to shoot, or can be readily restored to shoot automatically more than one shot, without manual reloading, by a single function of the trigger. This "term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." Id.

2

- a privately made pistol lower receiver modeled after a semi-automatic pistol,[3] along with an upper receiver, related firearm components, and six rounds of .380 ammunition for that firearm;
- a box labeled "PPU Handgun Line Ammunition," containing approximately 50 rounds of .25 auto caliber ammunition;
- and a box labeled "Speer Lawman Ammunition," containing approximately 50 rounds of .380 caliber ammunition.

Images of the privately made firearms—i.e., "ghost guns"—recovered at Nudelman's apartment are included below:



---

[3] Under 18 U.S.C. § 921(a)(1), the term "firearm" means, among other things, (A) any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; [and] (B) the frame or receiver of any such weapon." A lower receiver such as the one found in Nudelman's apartment qualifies as a "firearm" under this definition.



4



Nudelman was not present at his residence when the search warrant was executed on September 7.  Having recently been injured in a motorcycle accident, Nudelman was being treated for his injuries at a hospital.   Initially, Nudelman was treated at Staten Island North Hospital.  However, he was forced to leave after threatening hospital staff.  For example, on Aug. 23, 2023, according to an NYPD complaint report, Nudelman threatened staff members, saying "I'm going to come back and take care of this floor," a threat that is particularly chilling given the cache of weapons Nudelman possessed at his residence and his ability to assemble additional firearms.

Nudelman was next brought to Richmond University Hospital, where his aggressive and uncooperative behavior only escalated.  According to officers and hospital staff, he screamed and threw objects, including food and his own urine.  And when placed in handcuffs, he attempted to slip out of them.  Eventually, Nudelman had to be medically sedated by hospital staff.

On September 8, 2023, Nudelman was charged by criminal complaint with violation of Title 18, United States Code, Sections 922(g)(1) (felon in possession of firearms and ammunition) and 922(o) (possession of a machine guns).

II.   Legal Standard

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e). A finding of dangerousness must be supported by clear and convincing evidence, United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995), and risk of flight must be proven by a preponderance of the evidence, United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "the danger that the defendant might engage in criminal activity to the detriment of the community." United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (internal quotation marks omitted).

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, including whether the offense involves a controlled substance or a firearm; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g).

Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130–31 (2d Cir. 2000). In the pre-trial context, few detention hearings involve live testimony or cross-examination; rather, most proceed on proffer. LaFontaine, 210 F.3d at 131. This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." Id. (internal quotation marks omitted); see also United States v. Mercedes, 254 F.3d 433, 437 (2d Cir. 2001) ("[The defendant] has twice been convicted of weapon possession—one felony conviction, and one misdemeanor conviction. We find the district court committed clear error in failing to credit the government's proffer with respect to [the defendant's] dangerousness.").

Where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1).

III.  The Defendant Should Be Detained Pending Trial

The United States more than meets its burden of showing by clear and convincing evidence that the defendant poses a danger to the community. The crimes charged in this case are extremely serious. The defendant possessed an arsenal of deadly weapons, ammunition, and parts, including devices that could convert handguns to enable to them shoot not just one bullet each time the trigger is squeezed, but instead to continuously

6

fire until the trigger is lifted.  Such weapons—i.e., machine guns—are significantly more dangerous than semi-automatic weapons and can maim or injure numerous victims in a short period of time.  Indeed, such weapons are so dangerous that they are unlawful for anyone outside of the military and law enforcement to possess—not just prior felons.  The defendant also assembled untraceable and illegal "ghost guns"—weapons with no legitimate purpose other than criminal activity.  The fact that the defendant has prior attempted assault with a weapon and firearms convictions only underscores the clear risk of danger posed by his possession of these weapons.

As the Second Circuit has recognized, the possession of a firearm alone "gives rise to a risk of its use in violence." See United States v. Dillard, 214 F.3d 88, 94 (2d Cir. 2000); see also United States v. Munlyn, 607 F. Supp. 2d 394, 399 (E.D.N.Y. 2009).  This risk is magnified in a densely populated environment like Staten Island, and courts in this circuit thus regularly order detention in cases involving gun trafficking or possession.  See United States v. Williams, No. 20-CR-293-2, 2020 WL 4719982, at *3 (E.D.N.Y. Aug. 13, 2020) ("[T]he danger of Defendant's release is demonstrated through the fact [that] Defendant's instant and past offense involved the use of a firearm"); United States v. Harris, No. 19-CR-300, 2020 WL 4014901, at *7 (S.D.N.Y. July 16, 2020) ("Defendant's arrest for being a felon in possession itself raises the specter of danger to the community"); United States v. Smalls, No. 20-CR-126, 2020 WL 1866034, at *1 (S.D.N.Y. Apr. 14, 2020) (affirming a magistrate judge's order of detention that was based, in part, on "the general danger to the community posed by [the defendant's] apparently ready access to firearms"); see also United States v. Lyons, 675 F. App'x 28, 30 (2d Cir. 2017) ("The district judge indicated that felons in possession of firearms are a danger to society—the comment does not reflect an improper bias against firearms.  To the contrary, it is an opinion shared by Congress, which criminalized such conduct").  Here, the danger is even greater given the sheer volume of firearms, ammunition, and parts purchased and/or possessed by the defendant.

The defendant's erratic and aggressive behavior while receiving medical treatment also highlights the risk he poses to the community.  The defendant had to be removed from a hospital because he threatened the same staff that were providing him medical care.  And when transferred to another hospital, he had to be medically sedated just to manage his belligerent and unruly behavior—including continuous shouting and throwing his own urine.  Under these circumstances, there is simply no condition or combination of conditions that can ensure the safety of the community.

7

IV.     Conclusion

For the reasons set forth above, the government respectfully submits that the defendant should be permanently detained pending trial.

Respectfully submitted,

BREON PEACE
United States Attorney

By:     /s/ Matthew Skurnik
Matthew Skurnik
Assistant U.S. Attorney
(718) 254-6231

cc:     Clerk of Court (JRC) (by email)
Defense Counsel (by email)